# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| John Doe MC-1,<br><br>    Plaintiff,<br><br>v.<br><br>The University of Michigan, the Regents of The University of Michigan,<br><br>    Defendants. | Case No. 2:20-cv-10568-VAR-EAS<br><br>Hon. Victoria A. Roberts<br>Magistrate Judge Elizabeth A. Stafford<br><br>**Master Case Filing** |

### ORDER: (1) GRANTING UNOPPOSED MOTION TO ESTABLISH THE UM SURVIVORS' QUALIFIED SETTLEMENT FUND AND TO APPOINT QSF CO-ADMINISTRATORS; AND (2) ESTABLISHING THE UM SURVIVORS' QUALIFIED SETTLEMENT FUND AND TO APPOINT QSF CO-ADMINISTRATORS

The Plaintiffs' Co-Leadership Counsel, on behalf of Settlement Claimants, petitioned the Court to establish the UM Survivors' Qualified Settlement Fund and to appoint ARCHER Systems LLC as Fund Administrator and ARX Management, LLC as Investment Advisor. The Court considered Plaintiffs' Unopposed Motion and all other matters of record. The Court finds good cause to grant the motion and **ORDERS**:

    1.    UM2022 Qualified Settlement Fund is established as a Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1 and pursuant to the jurisdiction conferred on this Court by Treas. Reg. § 1.468B-1(c)(1).

    2.    U.S. Bank will be the Custody Bank of the Fund (the "Custody Bank").

3. ARCHER Systems, LLC, 1775 Saint James Place, Suite 200, Houston, TX 77056 is appointed as the "Fund Administrator" of the Fund (as a "qualified settlement fund") within the meaning of section 1.468B-2(k)(3) of the Regulations ("Administrator") responsible for administering the Fund.

4. ARX Management, LLC, 1730 E. Holly Ave #795, El Segundo, CA 90245 is appointed as the Investment Advisor of the Fund (as a "qualified settlement fund") within the meaning of section 1.468B-2(k)(3) of the Regulations ("Administrator") responsible for administering the Fund.

5. ARCHER and ARX collectively are appointed as QSF Co-Administrators of the Fund.

6. The Fund must be treated at all times as a "qualified settlement fund" within the meaning of §468B of the Internal Revenue Code of 1986, and Treas. Reg. §§ 1.468B-1 through 1.468B-5, 26 C.F.R. §§ 1.468B-1 through 1.468B-5 (1992) and be administered in accordance with the requirements of those Treasury Regulations. The parties must treat the Fund as a qualified settlement fund for all reporting purposes under the federal tax laws. It is the responsibility of the QSF Co-Administrators to prepare and deliver any necessary documentation for signature by all necessary parties, and to cause the appropriate filing to occur. All expenses associated with compliance with this provision must be paid from the Fund. The QSF Co-Administrators will be the "administrator" within the

meaning of Treas. Reg. § 1.468B-2(k)(3). Consequently, the responsibility for the filing of all informational and other tax returns necessary or advisable with respect to the Fund (including without limitation the returns described in Treas. Reg. § 1.468B-2(k)) is the QSF Co-Administrators'. Such returns must reflect that all taxes (including any estimated taxes, interest, or penalties) on the income earned on the Fund must be paid out of the Fund.

7. The Fund is immediately authorized to receive the payment of the Immediately Allocable Amount[1] from Defendants, and to hold that sum, subject to the continuing jurisdiction of this Court, until the QSF Co-Administrators are provided approved disbursement instructions in accordance with this Order.

8. Effective upon the deposit of the Immediately Allocable Amount into the Fund, all Released Claims (as defined in the Settlement Releases) by or on behalf of each Plaintiff Releasing Person must be fully and finally released and extinguished in accordance with the Settlement Releases executed by each Plaintiff Releasing Person, and any and all liability of the UM Released Persons with respect to the Released Claims of each Plaintiff Releasing Person must be fully and finally released and extinguished. In addition, upon the deposit of the Immediately Allocable Amount into the Fund, neither UM Defendants nor any of the UM

---

[1] Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in the parties' May 19, 2022 Private Master Settlement Agreement.

3

Released Persons will have any responsibility for the management, investment, disbursement, treatment, administration, or other handling of the Immediately Allocable Amount or its proceeds, or any liability arising from or relating in any way to the investment, management, disbursement, treatment, administration, or other handling of the Fund. Without in any way limiting the foregoing, upon the deposit of the Immediately Allocable Amount into the Fund, the UM Defendants and the UM Released Persons will be fully and completely released with respect to all matters arising after such deposit with respect to the Released Claims and the Immediately Allocable Amount (or the proceeds thereof), including but not limited to, the management, investment, disbursement, treatment, administration, or other handling of the Immediately Allocable Amount or its proceeds.

9. The Fund is authorized to effect qualified or non-qualified assignments of any resulting structured settlement liability or deferred compensation agreement as directed in writing by Claimants or Plaintiffs' Counsel.

10. The QSF Co-Administrators are authorized to distribute all funds, including attorney fees and litigation expenses to counsel for Claimants along with their co-counsel, consistent with their existing contingency fee contracts including the use of structured attorney fees.

11. The QSF Co-Administrators, upon completion and final distribution of all monies paid into the Fund, are authorized to take appropriate steps to wind down

the fund and thereafter discharge the QSF Co-Administrators from any further responsibility with respect to the Fund. The QSF Co-Administrators may, but are not obligated to, seek a final order of discharge from this Court.

12. No bond shall be required, provided that all monies received by the Fund, which include all principal and interest earned thereon, shall be deposited in a custody account held at U.S. Bank (the "Custody Bank"), a financial institution doing business in Minneapolis, MN, for the benefit of and titled in the legal name of the Settlement Fund and invested in instruments/securities comprised of (a) any obligations of, or any obligations guaranteed as to principal and interest, by the United States of America or any agency or instrumentality thereof; (b) cash equivalent securities including SEC registered money market funds and collateralized money market accounts; (c) short-term investment-grade securities; and/or (d) deposit and similar interest-bearing, or non-interest bearing accounts, and certificates of deposit subject to Federal Depository Insurance Corporation protections as available, which may be held within the custody account or at the issuer bank. The Custody Bank shall follow the instructions of the Investment Advisor, pursuant to these terms and conditions, such that a safety of principal investment policy is implemented. Notwithstanding the foregoing, the Custody Bank shall not be allowed to distribute any income or principal from the Settlement Fund except upon instructions of the Investment Advisor, or, if requested, upon the order

of this Court upon the joint motion of the parties. The Investment Advisor retains the right to remove the Custody Bank, and may designate a replacement bank, upon the written consent of Plaintiffs' Counsel. In the event of such replacement, the terms and conditions of this Paragraph - including, without limitation, those addressing bond requirements, investments, and distributions from the Settlement Fund-shall apply to any such replacement bank. The Investment Advisor is not liable for any losses as a result of investing the Deposit as directed by the Court. Any such losses are not recoverable from the parties, and the parties and their counsel will have no responsibility for The Investment Advisor performance. Receipt and/or investment of the Deposit must be confirmed to Plaintiffs' Counsel by The Investment Advisor as soon as practicable by account statement or other reasonable method.

13.    The QSF Co-Administrators and/or their respective attorneys must be indemnified by the Claimants and held harmless by Claimants against reasonable expenses, costs and fees (including attorney fees), judgment, awards, and liabilities of all kinds incurred by the QSF Co-Administrators from any and all claims made by any person or entity that attempts to assert a right of payment, reimbursement or garnishment against the Fund, except to the extent that it is finally determined by this Court that the QSF Co-Administrators, and/or its respective attorneys was/were negligent or acted with willful misconduct in connection with the administration of

this Fund. Neither the UM Defendants nor any of the UM Released Persons shall have any liability or responsibility whatsoever with respect to the indemnity described in this Paragraph, nor will they have any other liability or responsibility to indemnify or hold harmless the QSF Co-Administrators and/or their respective attorneys against any expenses, costs, fees (including attorney fees), judgment, awards, or liabilities of any kind.

14. Pursuant to Treas. Reg. § 1.468B-1(c)(1), the Court must exercise continuing jurisdiction over the Fund and must be the designated venue by operation of law for any and all disputes which may arise related to the Fund, the Fund's administration, and any disbursements and/or payments therefrom.

15. The Individual Plaintiff's Counsel for the Claimants whom they represent must be solely responsible for the investigation and resolution of Probate Complications and/or Other Complications for their respective Claimants as applicable and shall coordinate with the QSF Co-Administrators to provide clear and timely instructions for payment to the applicable parties for full satisfaction of the applicable Probate Complications and/or Other Complications. ARCHER must review and approve all documents for compliance with this Agreement prior to the distribution of funds by the QSF Co-Administrators.

16. Without in any way limiting the qualifications and duties of the QSF Co-Administrators, the Lien Administrator, or the Bankruptcy Coordination

Administrator[2], the QSF Co-Administrators, the Lien Administrator, and the Bankruptcy Coordination Administrator must work with each other and Individual Plaintiff's Counsel to address any Complications relating to an Action, Anderson-Related Claim, Settled Claim, Settlement Release, or Allocated Share, including but not limited to: (i) the Lien Administrator's identification, resolution, payment, and/or satisfaction of any Lien Complications; (ii) the Bankruptcy Coordination Administrator's performance of a bankruptcy analysis and resolution procedure to identify and resolve any Bankruptcy Complications; and (iii) the QSF Co-Administrators' payment of applicable third party probate, bankruptcy, and/or other interests as directed by Individual Plaintiff's Counsel for the Claimants they represent in connection with resolution of Probate Complications and/or Other Complications, and the Bankruptcy Coordination Administrator in connection with resolution of Bankruptcy Complications. As part of their duties, the QSF Co-Administrators, the Bankruptcy Coordination Administrator, and the Lien Administrator are entitled to hire agents or third parties to assist with their respective duties, including attorneys who specialize in lien, probate, or bankruptcy matters, with the fees and costs for such agents or third parties deemed part of the administration of the Qualified Settlement Fund; provided, however, that the QSF

---

[2] Co-Leadership Counsel filed a Motion on August 2, 2022 requesting the Court appoint ARCHER Systems, LLC as the Bankruptcy Coordination Administrator and the Lien Administrator over this Settlement.

Co-Administrators, the Bankruptcy Coordination Administrator, and/or the Lien Administrator must supervise and remain responsible for the work of any agents or third parties whom they hire.

17. If any proceeds that an individual Claimant receives as a result of the Parties' MSA, or any Action or Allocated Share are or become subject to a Lien Complication or Other Complication, then, in advance of payment to that respective Claimant by the QSF Co-Administrators from the Qualified Settlement Fund, the QSF Co-Administrators must hold in the U.S. Bank Custody Account, and not distribute to that respective Claimant from the Qualified Settlement Fund, funds equal to the amount of any and all Lien Complications or Other Complications (a "Lien or Other Complication Holdback Amount"), established and communicated by the Lien Administrator. QSF Co-Administrators must use the Lien or Other Complication Holdback Amount to satisfy any Lien Complications or Other Complications of a given Claimant as directed by the Lien Administrator and the Individual Plaintiff's Counsel, and must not distribute the remainder (if any) to the respective Claimant until directed to do so by the Lien Administrator and the Individual Plaintiff's Counsel when each Lien Complication and Other Complication asserted by each such Lienholder has been resolved or waived.

18. Any payment for a Lien determined by the Lien Administrator to be owed to any Lienholder to satisfy any Lien Complication must be paid directly from the QSF at the direction of the QSF Co-Administrators.

19. A Bankruptcy Claimant's Bankruptcy Complications shall not be deemed to be resolved unless and until such time as the Bankruptcy Coordination Administrator obtains, and provides a copy to the UM Defendants of, either: (i) a written representation and warranty from a duly authorized bankruptcy trustee on behalf of or with respect to the Bankruptcy Claimant's bankruptcy estate that either (x) the Bankruptcy Claimant's bankruptcy estate has no interest in the Bankruptcy Claimant's Action, Anderson-Related Claim, and Allocated Share, or (y) that the Bankruptcy Claimant's bankruptcy estate is, pursuant section 544 of the Bankruptcy Code, abandoning the Bankruptcy Claimant's Action, Anderson-Related Claim, and Allocated Share to the Bankruptcy Claimant, (in which case the Bankruptcy Claimant shall subsequently ratify their earlier-executed Settlement Release and provide the ratification to the Lien Administrator); or (ii) a Settlement Release or substantially similar document executed by the applicable bankruptcy trustee on behalf of or with respect to the Bankruptcy Claimant's bankruptcy estate, and approved by a United States bankruptcy court, ratifying the Bankruptcy Claimant's previously signed Settlement Release and forever releasing the UM Released Persons from all Anderson-Related Claims and any Bankruptcy Complications with

respect to both the Bankruptcy Claimant and the Bankruptcy Claimant's bankruptcy estate, as if the Bankruptcy Claimant's originally executed Settlement Release had been fully executed and/or approved by the applicable bankruptcy trustee and approved by a United States bankruptcy court at the time the Bankruptcy Claimant originally executed his, her, or its Settlement Release.

20. The QSF Co-Administrators must distribute the Bankruptcy Claimant's Allocated Share, in accordance with instructions from the applicable bankruptcy trustee as communicated by the Bankruptcy Coordination Administrator, in the event that a Settlement Release or substantially similar document is executed by the applicable bankruptcy trustee on behalf of or with respect to the Bankruptcy Claimant's bankruptcy estate, and such Settlement Release or substantially similar document is approved by the applicable United States bankruptcy court.

21. The QSF Co-Administrators are prohibited from distributing any portion of a Bankruptcy Claimant's Allocated Share unless and until such time as that Bankruptcy Claimant's Bankruptcy Complications have been fully resolved and the Bankruptcy Coordination Administrator has obtained, and provided a copy to the UM Defendants of, the documents described in Paragraph 19.

22. If the Bankruptcy Coordination Administrator is unable to resolve a Bankruptcy Claimant's Bankruptcy Complications by obtaining the documents described in Paragraph 19 within twelve (12) months of the payment of the

Settlement Amount, then: the Bankruptcy Coordination Administrator must provide to the UM Defendants copies of at least two written communications (no less than two months apart) from the Bankruptcy Coordination Administrator to both the applicable bankruptcy trustee and the Office of the United States Trustee for the District in which the bankruptcy occurred providing notice of the Bankruptcy Claimant's Action, Anderson-Related Claim, and Allocated Share, and certify that the Bankruptcy Coordination Administrator received no response to such communications; upon the UM Defendants' receipt of those two written communications and the certification that the Bankruptcy Coordination Administrator received no response to the communications, the QSF Co-Administrators may distribute to the Bankruptcy Claimant that individual Bankruptcy Claimant's Allocated Share, less a "Bankruptcy Holdback Amount," defined as the greater of (a) 40% of that individual Bankruptcy Claimant's Allocated Share or (b) the total amount of debt that was discharged in that individual Bankruptcy Claimant's bankruptcy proceedings; and shall continue to hold in escrow that individual Bankruptcy Claimant's Bankruptcy Holdback Amount.

23. If the Bankruptcy Coordination Administrator is unable to resolve a Bankruptcy Claimant's Bankruptcy Complications within eighteen (18) months of the payment of the Settlement Amount, then: the Bankruptcy Coordination Administrator must provide to the UM Defendants copies of at least one additional

written communication from the Bankruptcy Coordination Administrator to both the applicable bankruptcy trustee and the Office of the United States Trustee for the District in which the bankruptcy occurred providing notice of the Bankruptcy Claimant's Action, Anderson-Related Claim, and Allocated Share, and certify that the Bankruptcy Coordination Administrator received no response to such communications; upon the UM Defendants' receipt of that additional communication and the certification that the Bankruptcy Coordination Administrator received no response to the communication, the QSF Co-Administrators may distribute to the Bankruptcy Claimant 90% of that individual Bankruptcy Claimant's Allocated Share; and must continue to hold in escrow 10% of that individual Bankruptcy Claimant's Allocated Share.

24.   If the Bankruptcy Coordination Administrator is unable to resolve a Bankruptcy Claimant's Bankruptcy Complications within twenty-four (24) months of the payment of the Settlement Amount, then: the Bankruptcy Coordination Administrator must provide to the UM Defendants copies of at least one additional written communication from the Bankruptcy Coordination Administrator to both the applicable bankruptcy trustee and the Office of the United States Trustee for the District in which the bankruptcy occurred providing notice of the Bankruptcy Claimant's Action, Anderson-Related Claim, and Allocated Share, and certify that the Bankruptcy Coordination Administrator received no response to such

communications; upon the UM Defendants' receipt of that additional communication and the certification that the Bankruptcy Coordination Administrator received no response to the communication, the QSF Co-Administrators may distribute to the Bankruptcy Claimant the remaining 10% of that Bankruptcy Claimant's Allocated Share. In all events, each individual Bankruptcy Claimant's executed Settlement Release must remain fully binding and enforceable.

25. In lieu of the procedure outlined in paragraphs 19 through 24, the UM Defendants, in their sole discretion, may accept a proposal by Plaintiffs' Co- Lead Counsel, through insurance or an indemnity agreement by ARCHER, to indemnify and hold harmless the UM Defendants from liability for any claim related to a Bankruptcy Complication.

26. The Individual Plaintiff's Counsel for the Claimants whom they represent has the responsibility to identify and resolve, and to protect the UM Released Persons from, all Probate Complications and/or Other Complications of the Claimants they represent, and Plaintiffs' Counsel further agree that the Individual Plaintiff's Counsel for the Claimants whom they represent shall have such duties. Such responsibilities include, but are not limited to: conducting appropriate inquiries to identify all Probate Complications and Other Complications; reporting to the UM Defendants and the QSF Co-Administrators which Claimants are Probate Claimants; and taking all steps necessary and proper to resolve each Probate Claimant's Probate

Complications and each Claimant's Other Complications. ARCHER must review and approve all documents for compliance with this Agreement prior to the distribution of funds by the QSF Co-Administrators.

27. A Probate Claimant's Probate Complications must not be deemed to be resolved unless and until such time as the Individual Plaintiff's Counsel for the Claimants they represent obtains and provides to ARCHER: (i) a Settlement Release or substantially similar document executed by the executor, administrator, or other duly authorized personal representative of the Probate Claimant's estate ratifying the originally executed Settlement Release, and forever releasing the UM Released Persons from all Anderson-Related Claims and any Probate Complications with respect to that Probate Claimant's estate; and (ii) if required by the laws and procedures applicable to the Probate Claimant's estate, an order from a probate court or other court with jurisdiction over the administration of the Probate Claimant's estate approving of the Probate Claimant's Settlement Release.

28. The QSF Co-Administrators are prohibited from distributing any portion of a Claimant's Allocated Share unless and until such time as any Probate Complications and any Other Complications have been fully resolved, Individual Plaintiff's Counsel has obtained, and provided a copy to the UM Defendants and ARCHER, of the documents described in Paragraph 27, and the QSF Co-Administrators have received payment instructions from Individual Plaintiff's

Counsel for distribution of funds to satisfy the resolved Probate Complications and/or Other Complications.

29. Within 15 days of the Special Masters determination of each Claimant's final Allocated Share of the Immediately Allocable Amount[3], the Special Masters must provide to the UM Defendants a report of each Claimant's Allocated Share pursuant to the Michigan Court's Protective Order, ECF Nos. 73, 131, 156, in *John Doe MC-1 v. the University of Michigan and the Regents of the University of Michigan*, Case No. 20-cv-10568-VAR-EAS; further, each Claimant's Allocated Share, including each Claimant's amounts and identifiers, may be shared with authorized persons under that Protective Order, including but not limited to the Insurers and their counsel as defined in that Protective Order. In addition, within 90 days from the payment of the Settlement Amount, and on a monthly basis thereafter, ARCHER (as the Bankruptcy Administrator and Lien Administrator) will provide to the UM Defendants an audit report that will identify and report on the status of, with respect to each Claimant, all Lien Complications, Bankruptcy Complications, Probate Complications, and Other Complications; or alternatively, affirmatively state that such Lien Complications, Bankruptcy Complications, Probate

---

[3] A Claimant's Allocated Share is not final until after any and all appeal rights (any Claimant may contest, if desired, his, her, or its Allocated Share, through notice and opportunity to be heard) have been exhausted as outlined in the MSA.

Complications, and Other Complications do not exist or have been resolved, as a prerequisite to such Claimant receiving an Allocated Share.

30. In some circumstances, Claimants may elect a structured settlement annuity. Likewise, Plaintiffs' Individual Counsel may elect to place all or a portion of their contingent legal fees into one of several types of tax-advantaged investments as Plaintiffs' Individual attorneys have the ability to defer fees until a later taxable year.[4] To facilitate Claimant structured settlements or attorney fee structure(s), if any, the Fund, by and through the QSF Fund Administrator, may purchase and assign structured settlements whether "qualified"[5] or "non-qualified"[6]. Any "qualified" structured settlement must be issued by a life insurance company that holds an issuer credit rating equivalent to a National Association of Insurance Commissioners NAIC 1 designation.

31. The Fund Administrator has the right to rely upon any affidavit, certificate, letter, notice, electronic mail, or other document provided to the Fund Administrator and in the Fund Administrator's reasonable

---

[4] *See Childs v. Commissioner,* 103 T.C. 634 (1994), *aff'd*, 89 F.3d 856 (11th Cir. 1996).

[5] Structured Settlement Payments are assigned to a qualified assignee by entering into qualified assignments of such structured settlement payments within the meaning of Section 130(c) of the Internal Revenue Code. The qualified assignee shall, respecting each person who is to receive periodic payments under a settlement agreement, purchase one or more qualified funding assets within the meaning of Section 130(d) of the Internal Revenue Code to fund any structured settlement payments assigned to the qualified assignee.

[3] A non-qualified assignment does not rely upon nor must it comply with Internal Revenue Code Section 104 and/or 130 to effect such assignment. See P.L.R. 200836019.

judgment believed to be genuine and sufficient. By way of example, this may include but is not limited to, wire instructions, IRS Form W-9, Plaintiffs' Individual Counsel communications, payment instructions, fee deferment instructions, and the like.

32. The monies to be held in the Fund are the sole property of the Fund. Until such time as funds are distributed from the Fund, the Claimants have no right to demand or receive any portion of the escrowed funds and have no right to mortgage, pledge, or encumber the same in any manner. This Order must be construed, to the fullest extent possible, so as to prevent the Claimants from being in constructive receipt, as determined under federal income tax principles, of any amounts held by the Fund.

33. Upon completion of all Fund agreements and final distribution of all monies to be paid into the Fund, the Fund Administrator must take appropriate steps to wind down the Fund and be discharged from any further responsibility with respect to the Fund.

34. The Fund Administrator will obtain a Federal Taxpayer Identification Number for the Fund upon the execution of an order by the Court establishing the Fund.

**IT IS ORDERED.**

                                              s/ Victoria A. Roberts
                                              Victoria A. Roberts
                                              United States District Judge

Dated: 9/16/2022